# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:18-CR-00219 |
| v. | (Judge Brann) |
| RODREQUIS COUNCIL, | |
| Defendant. | |

## MEMORANDUM OPINION

### SEPTEMBER 1, 2020

Currently pending before the Court is Rodrequis Council's motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A).[1] Council contends that he is entitled to release to home confinement due to the COVID-19 pandemic and his particular susceptibility to the virus.[2] The Government opposes the motion.[3]

## I.   BACKGROUND

In 2018, a criminal information was filed charging Council with armed bank robbery, in violation of 18 U.S.C. §§ 2113(a), (d).[4] Council thereafter pled guilty, pursuant to a written plea agreement, to that count.[5] The guilty plea was accepted and a Presentence Report (PSR) was prepared.

---

[1] Doc. 47.
[2] *Id.*
[3] Doc. 54.
[4] Doc. 1.  Council waived his right to indictment by a grand jury.  (Doc. 12).
[5] Docs. 3, 13.

The PSR noted that Council and a coconspirator built two devices that were designed to look like bombs, and placed those devices at two locations in State College, Pennsylvania.[6] They then called in two bomb threats and, while police were distracted responding to those threats, Council's coconspirator entered an SPE Federal Credit Union in State College, placed what appeared to be an explosive device on the counter, and handed the teller a note that stated the bomb would detonate if he did not receive money; the bank teller placed more than $7,000 in a bag, and the coconspirator left the bank.[7] Council provided the coconspirator with a vehicle to use during the robbery and paid for a motel for the coconspirator to use until he left the state.[8]

The PSR also detailed Council's lengthy criminal history—a history that spanned his entire adult life. These convictions include several minor offenses, as well as more serious crimes such as felony breaking or entering, interference with commerce by robbery ("Hobbs Act Robbery"), and use of a firearm during and in relation to a crime of violence.[9]

At sentencing, this Court departed upward from the Sentencing Guidelines range and sentenced Council to 108 months' imprisonment, to be served consecutive

---

[6] Doc. 19 at 3.
[7] *Id.* at 3-4. The devices remained in the bank, and a bomb squad was called in to attempt to defuse what they thought was a bomb. *Id.*
[8] *Id.* at 4.
[9] *Id.* at 6-10.

to any sentence that Council faced for his violation of supervised release.[10] The Court determined that such a sentence was warranted due primarily to the nature of the crime, which involved the use of fake bombs that inflicted fear and panic, and Council's extensive criminal history.[11]

Council is currently incarcerated at the Federal Correctional Institution Hazelton, located in Bruceton Mills, West Virginia ("FCI Hazelton"), and has filed a motion for compassionate release.[12] In his motion, Council asserts that he suffers from hypertension and kidney failure, which places him at a higher risk of serious illness or death should he contract COVID-19.[13] The Government concedes that Council's medical conditions place him at an elevated risk of harm from COVID-19, but responds that the relevant 18 U.S.C. § 3553(a) sentencing factors militate against releasing Council to at-home confinement.[14] This motion is ripe for consideration and, for the following reasons, Council's motion will be denied.

## II. DISCUSSION

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization."[15] Congress has provided courts with the authority to modify sentences through its enactment of 18 U.S.C.

---

[10] Doc. 31.
[11] Doc. 44 at 10-11, 36-42.
[12] Doc. 47.
[13] Doc. 52.
[14] Doc. 54.
[15] *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007).

§ 3582(c)(1)(A). That statute permits courts to reduce an inmate's sentence if the inmate has exhausted his administrative remedies[16] and if, as relevant here, "extraordinary and compelling reasons warrant such a reduction."[17] Courts should also consider the relevant § 3553(a) sentencing factors[18] and whether "the defendant is . . . a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[19]

### A.     Extraordinary and Compelling Reasons

Congress has not defined the term "extraordinary and compelling." However, the Sentencing Guidelines define the term to include a terminal illness, or any non-terminal illness "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[20] This definition is not, however, authoritative, as "[t]he Commission has not updated its policy statement to account for the changes imposed by the First Step Act, and the policy statement is now clearly outdated."[21] Thus, while "the Policy Statement provides useful guidance for district courts in assessing a defendant's eligibility for compassionate release, . . . it does not constrain a court's

---

[16] The Government concedes that Council has exhausted his administrative remedies. (Doc. 54 at 18).
[17] 18 U.S.C. § 3582(c)(1)(A)(i).
[18] *Id.*
[19] U.S. Sentencing Guidelines Manual § 1B1.13(2).
[20] USSG § 1B1.13, cmt. n.1(A).
[21] *United States v. Rodriguez*, __ F.Supp.3d __, __, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020).

4

independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)."[22] "The burden rests with the defendant to show that a reduction in sentence is proper."[23]

Here, Council has sustained his burden of establishing that extraordinary and compelling reasons weigh in favor of granting compassionate release. As an initial matter, the Court notes that the existence of COVID-19 cannot alone justify compassionate release. As the United States Court of Appeals for the Third Circuit has explained:

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, . . . But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.[24]

Thus, to demonstrate extraordinary and compelling reasons for compassionate release, movants must show that they suffer from one or more ailments that render them particularly susceptible to serious injury or death should they contract COVID-19.

Council's medical records reveal that he suffers from both hypertension and stage two chronic kidney disease.[25] The Centers for Disease Control and Prevention

---

[22] *United States v. Guzman*, No. 3:16-CR-85, 2020 WL 4515476, at *3 (M.D. Pa. Aug. 5, 2020) (brackets and internal quotation marks omitted).
[23] *United States v. Rengifo*, No. CV 1:13-CR-00131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020).
[24] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).
[25] Doc. 54-1 at 7-11.

(CDC) lists chronic kidney disease as a factor that increases an individual's risk for serious complications from COVID-19, and lists hypertension as an underlying condition that could increase such risk.[26] The risks posed by chronic kidney disease in particular have been confirmed by numerous studies.[27] Thus, as the Government concedes,[28] it is clear that Council is at a high risk of serious illness or death from COVID-19, and has therefore "shown 'extraordinary and compelling reasons' that would allow the court to grant compassionate release."[29]

Furthermore, the relatively low prevalence of COVID-19 at FCI Hazelton does not weigh against compassionate release. Numerous courts "have recognized that the nature of the prison environment itself enhances the likelihood that prisoners will catch this highly contagious virus."[30] Additionally, there are currently two cases of COVID-19 among the staff members at FCI Hazelton, while five staff members

---

[26] *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019, People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Aug. 25, 2020). The CDC notes that individuals with hypertension are at three times the risk of serious illness as are people without underlying conditions, those with chronic kidney disease are four times more susceptible, and individuals with two or more underlying conditions are four and one-half times more susceptible to serious illness as are individuals without underlying conditions. Centers for Disease Control and Prevention, *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html (last visited Aug. 25, 2020).

[27] *See* Centers for Disease Control and Prevention, *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited Aug. 25, 2020).

[28] Doc. 54 at 18-20.

[29] *United States v. Horton*, No. 1:13-CR-16, 2020 WL 4473405, at *4 (M.D. Pa. Aug. 4, 2020).

[30] *United States v. Perkins*, No. 14-CR-104-LM-1, 2020 WL 4783558, at *5 (D.N.H. Aug. 18, 2020).

have recovered from COVID-19,[31] which demonstrates that the introduction and possible spread of COVID-19 in that facility is more than a mere theoretical possibility.

### B.   Relevant Sentencing Factors

Turning next to the relevant § 3553(a) factors, the Court concludes that said factors militate against a sentence reduction. The relevant sentencing factors to consider under § 3553(a) include, *inter alia*, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."[32]

As to the nature and circumstances of the offense and the history and characteristics of the defendant, the Court notes that the offense was a serious one. As the Court discussed during sentencing:

> Mr. Council and his accomplice, together, created an elaborate scheme to rob the SPE Federal Credit Union in Centre County, Pennsylvania. A scheme that not only involved robbing the credit union itself to steal money but also involved creating fake explosive devices, calling in bomb threats and placing fake explosive devices in two locations to delay police responsiveness.

---

[31]  *See COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Aug. 26, 2020).

[32]  18 U.S.C. § 3553(a).

>As I mentioned earlier, the diversionary tactics of Mr. Council and his accomplice caused Wal-Mart and Penn State to be evacuated. In addition to inflicting fear and panic, these evacuations caused commerce to shut down. The victims had no idea if or when those devices would explode.
>
>Then there's the actual robbery of the credit union itself. Mr. Council's accomplice entered the credit union and threatened the teller with a note, which stated, in part, quote, If a dye pack goes off, the bomb will. If anyone walks out behind, then I will detonate the bomb, end quote.
>
>Mr. Council's accomplice left the credit union with $7,177.65 in hand but left the bomb behind. The victims in the credit union had no idea whether the bomb would go off. The Federal Bureau of Investigation bomb squad had to respond to the credit union and used a robot to pick apart the device.[33]

Armed robbery is a serious offense, and Council's actions caused numerous people for fear for their lives. Those individuals had no way of knowing that the devices Council and his coconspirator created were fake, and similarly had no way of knowing whether the devices could or would detonate at any moment and kill them. The incredible seriousness and dangerousness of the offense is reflected in the upward departure and 108-month sentence that this Court imposed.

As to Council's history, he is well-educated and a seemingly intelligent individual. He graduated from high school and university and was enrolled at Pennsylvania College of Technology at the time of sentencing.[34] On the one hand, this demonstrates that Council should have an easier time than many readjusting to

---

[33] Doc. 44 at 37-38.
[34] Doc. 19 at 13.

life after incarceration and finding steady employment that would permit him to lead a law-abiding life. On the other hand, as the Court noted during sentencing, "Mr. Council's educational accomplishments suggest that he should have known better; that is to say that Mr. Council was, in fact, acquainted with what acceptable standards of behavior are."[35]

Finally, Council also has a lengthy and serious criminal history, and has been convicted of felony breaking or entering, use of a firearm during a crime of violence, and Hobbs Act Robbery.[36] This history weighs against immediate release from custody, and also dovetails into the further goal of protection of the public.

Turning to the need to protect the public, the Court again notes that Council's criminal history is lengthy, serious, and demonstrates some propensity for violence. Most notable is Council's 2008 conviction for Hobbs Act Robbery. The PSR reveals that, during the commission of that offense, Council pointed a handgun at a clerk in a convenience store and demanded money.[37] Not only did Council cause the store clerk to fear for his life, but Council actually placed the clerk in mortal danger by using a firearm during the commission of that robbery. Even if Council had no intention of discharging the firearm, it could have discharged accidentally[38] or, more likely, the situation could have escalated out of control in ways unforeseeable to

---

[35] Doc. 44 at 39.
[36] Doc. 19 at 6-10.
[37] *Id.* at 7.
[38] The PSR reveals that Council was arrested the same day that he committed the robbery and, critically, police discovered that the handgun in Council's car was loaded. *Id.*

9

Council. For example, the clerk could have physically resisted Council, causing the firearm to discharge—either intentionally or accidentally—or a bystander could have used a firearm in defense of the clerk, causing either the bystander or Council to discharge their firearm. At bottom, the use of a firearm during a robbery is inherently dangerous,[39] and demonstrates—along with Council's armed robbery conviction—that the public must be protected from Council's criminal actions.

Furthermore, Council was released from federal custody for his Hobbs Act Robbery conviction in late October 2015.[40] Council was thus still serving his term of supervised release when he committed the armed robbery for which he is now in federal custody, and he violated his supervised release by committing a serious offense.[41] This, of course, only adds to the Court's concern that Council cannot safely be released from custody for the duration of his remaining sentence.

Balanced against these concerns is Council's education and upbringing, which indicates that he could leave his criminal lifestyle behind—if only he chose to so do. Council also appears to have a strong family support network, which could ease any transition out of confinement.[42] Despite these positive factors, the Court concludes

---

[39] *Cf. United States v. Couch*, 291 F.3d 251, 255 (3d Cir. 2002) (noting that Congress passed laws criminalizing the use of firearms during crimes of violence after recognizing the need to "protect our communities from violent criminals who repeatedly demonstrate a willingness to employ deadly weapons").
[40] Doc. 19 at 7.
[41] *See id.* at 7, 10.
[42] *Id.* at 11.

that Council's history of serious and occasionally violent offenses indicates a strong need to protect the public and afford adequate deterrence.

Turning last to the need to promote respect for the law, to provide just punishment for the offense, and to reflect the seriousness of the offense,[43] none of these sentencing goals would be met by granting compassionate release to Council at this time. Council was arrested on November 2, 2017, and currently has a projected release date of May 10, 2026, assuming that he earns all available good time credit. Thus, Council has served approximately one-third of his nine-year sentence. The Court ruled, with good reason, that a nine-year sentence for this troubling crime was sufficient but not greater than necessary under the circumstances. A release from custody nearly six years early—before Council has served even half of his sentence—simply would not promote respect for the law, provide just punishment for the offense, or reflect the seriousness of the offense, particularly when the COVID-19 pandemic likely will not extend for the six-year duration of Council's remaining sentence. Accordingly, the Court concludes that the relevant § 3553(a) factors weigh against granting compassionate release.

### C. Dangerousness

Finally, the Court will consider whether "the defendant is . . . a danger to the safety of any other person or to the community, as provided in 18 U.S.C.

---

[43] 18 U.S.C. § 3553(a).

11

§ 3142(g)."[44] As discussed above, it is apparent to the Court that Council still presents a danger to his community. Council was convicted in 2004 of felony breaking or entering, in 2006 of possession of stolen goods or property and possession of marijuana, and in 2008 of Hobbs Act Robbery and use of a firearm during a crime of violence.[45] After his release for that crime, while on supervised release Council was convicted in 2016 for having an open container of beer and driving while impaired, in 2017 for public urination and defiant trespass and, lastly, in 2018 for armed robbery.[46]

Council's criminal conduct has been consistent and dangerous. His criminal history is concerning not simply because of its dangerousness, but also because multiple—and occasionally lengthy—sentences have not deterred him from further criminal conduct, nor has supervision from a probation officer. Thus, the Court concludes that Council currently presents a danger to the community if released from confinement; "[t]his finding weighs heavily against his release."[47]

### D. Weighing the Relevant Considerations

After weighing the relevant considerations, the Court concludes that the danger that Council presents to the public, along with the § 3553(a) factors,

---

[44] USSG § 1B1.13(2).
[45] Doc. 19 at 6-9.
[46] *Id.* at 9-10.
[47] *Delacruz v. United States*, No. 18-CV-811-LM, 2020 WL 3270503, at *4 (D.N.H. June 17, 2020).

outweigh Council's extraordinary and compelling reasons for compassionate release.

The Court is not, however, unsympathetic to Council's situation, and the risk of harm or death from COVID-19 is a serious issue. Given Council's comorbidities, he is plainly vulnerable to serious illness should he be infected with COVID-19. While the Court believes a nine-year sentence is necessary in this instance, it is mindful that "[a] death sentence is neither a just sentence nor one that would promote respect for the law."[48] Accordingly, although there is little that the Court may do to ensure Council's safety while in custody, it will recommend that Council be transferred to a facility with a dedicated hospital wing that is capable of adequately caring for Council should he contract COVID-19.

### III.   CONCLUSION

For the foregoing reasons, Council's motion for compassionate release will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[48]   *Perkins*, 2020 WL 4783558, at *9.